USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/28/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
Maxwell Hare,                                    :
                                                 :
                              Petitioner,        :         REPORT AND RECOMMENDATION
                                                 :         22-CV-3190 (CM) (KHP)
                    -v.-                          :
                                                 :
Mark Rockwood, Superintendent of Gouverneur      :
Correctional Facility,                           :
                              Respondent.        :
------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/18/2023

**TO:      THE HONORABLE COLLEEN MCMAHON, United States District Judge**

**FROM: KATHARINE H. PARKER, United States Magistrate Judge.**

On August 19, 2019, Petitioner Maxwell Hare ("Petitioner"), was convicted of one count

of Attempted First-Degree Gang Assault, one count of Attempted Second-Degree Assault, one

count of Second-Degree Riot, and two counts of Attempted Third-Degree Assault after a jury

trial in the Supreme Court of the State of New York.  Petitioner was sentenced to four years in

prison followed by five years of post-release supervision.  The Appellate Division, First

Department, affirmed the convictions.  *People v. Kinsman*, 191 A.D.3d 539 (2021).  The New

York Court of Appeals denied leave to appeal.  *People v. Hare*, 36 N.Y.3d 1120 (2021).  Before

the Court for a Report and Recommendation is a Petition for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254.  For the reasons set forth below, I recommend that the Petition be denied.

**BACKGROUND**

MEMO ENDORSED

**1.  Facts Giving Rise to Conviction**

In 2018, Petitioner lived in New Jersey and worked for Amtrak.  (Hare Tr. A.880.)[1]  On

October 12, 2018, Petitioner went to a bar on the Upper East Side of Manhattan where he met

---

[1]  Citations to the trial transcripts refer to the State Record, which is available on the docket of Petitioner's co-
defendant's habeas action, at *Kinsman v. Rawson*, 22-cv-3338 (PGG) (SDA), ECF No. 20-1.

9/18/2023  No objections have been filed. The court adopts the Report
as its opinion. The Petition is DENIED. Clerk to close case.
As the petition presents no issue of constitutional substance the certificate of appealability

shall issue.

[handwritten right margin]: appeal would not be taken in good faith. see rule 24.

up with several individuals who, like Petitioner, were members of the right-wing extremist group, the Proud Boys. (*Id.* at A.891.) Petitioner wore Dr. Martens boots that he had purchased earlier that day. (*Id.* at A.888-90, A.1058.) At around 6:30 p.m. that evening, Petitioner and approximately 30 other Proud Boys members left the bar together to attend an event (the "Event") at the Metropolitan Republican Club ("MRC"), which is located in Manhattan on 83rd Street between Park Avenue and Lexington Avenue. (*Id.* at A.892.) Gavin McInnes, founder of the Proud Boys, was the guest speaker at the Event.

A large group of protestors gathered outside the MRC Event. Among the protestors were individuals associated with "Antifa," a "loosely affiliated movement" comprised of individuals who oppose fascism, including through violent tactics. (Segal Tr. A.195.) Earlier that day, Antifa-affiliated protestors had made threatening calls to the MRC president asking that the event be cancelled and had left a "manifesto" outside the MRC that threatened violence if the Event moved forward. (*Id.* at A.215.) As Petitioner walked towards the MRC, he yelled to the protesters, "I'll see you at the parking lot." (Mays Tr. A.548.)

The Event concluded at 8:00 p.m. To avoid a confrontation between Event attendees and protestors, police officers directed the attendees to walk west toward Park Avenue and southward to the train station and directed the protestors to remain on the north side of 83rd Street. (*Id.* at A.505.) When Petitioner left the MRC, he walked south on Park Avenue with a group of other Proud Boys and with a police escort. When Petitioner reached 82nd Street, he observed a group of six protestors to his left who appeared to be affiliated with Antifa. The protestors were over 100 feet away from Petitioner and were walking west along 82nd Street

toward Park Avenue. (Hare Tr. A.926; Schoenfeld Tr. A.1193-94.) They wore masks and black sweatshirts with hoods that covered their faces.

On observing the protestors, Petitioner clapped his hands and yelled to alert the other Proud Boys members to the presence of the protesters. (Hare Tr. A.1016-17; People's Exs. 3, 7, 8). Petitioner dropped his backpack and ran towards the protestors. One of the protestors threw a clear plastic bottle in Petitioner's direction, which missed Petitioner and landed on the sidewalk. (Hare Tr. A.910; Mays Tr. 607-11.) At this point, the protestors were standing in one spot and were not walking toward Petitioner. Petitioner then charged towards the group and "grab[ed] the first guy that [he] could see" – "JD Ponytail."[2] (Hare Tr. A.911.) This occurred on the sidewalk just outside a gated service entrance for the building located at 969 Park Avenue. Petitioner then punched JD Ponytail, pulled him to the ground, and removed his mask. (People's Exs. 3, 7.)



*Still Image from People's Exhibit 7 shows Petitioner (in the red hat) grab JD Ponytail.*

---

[2] As none of protestors were identified, they were assigned nicknames based on distinctive characteristics, including JD Ponytail (John Doe sporting a ponytail), and JD Shaved Head (Jane Doe sporting a shaved head).

A group of about nine other Proud Boys joined Petitioner outside the service entrance, and a physical fight broke out between the ten Proud Boys and the six protestors. The fight lasted approximately one minute and was captured on video from security cameras in the area and bystander cell phone cameras. The footage shows the individuals grab, hit, punch, and kick each other. As for Petitioner, video footage shows that after Petitioner removed JD Ponytail's mask, another Proud Boy held onto JD Ponytail while Petitioner held JD Ponytail's head against the concrete sidewalk and punched him in the head and shoulder four times and elbowed him in the torso twice. (People's Exs. 5, 7, 8.) Cell phone footage captured Petitioner yell, "Take this, motherfucker," and "I just stomped the shit out of him." (*Id.*; Hare Tr. A.1178.) Petitioner then walked away from JD Ponytail as another Proud Boy kicked JD Ponytail in the back, and Petitioner joined two other Proud Boys who were kicking JD Shaved Head while she was on the ground. Petitioner punched JD Shaved Head twice in the torso and kicked her once while she sat with her head tucked between her knees and her hand over her head. (*Id.*)



*Images from People's Exhibit 6 show Petitioner's arm extended before punching JD Shaved Head*

4

Shortly thereafter, a Proud Boys member pulled Petitioner away from JD Shaved Head

as police arrived at the scene. The individuals who were present at the altercation disbursed,

and nobody was arrested at the scene. Officer Patrick Conley responded to the scene and

observed two people sitting on the ground, one of whom was a woman with a shaved head,

and he heard the woman say that she had been "punched like 70 times." (Conley Tr. A.403.)

Officer Conley tried to speak with the woman but a group of people standing near her asked

him to leave and blocked his view of the two individuals. (Id. at 409.) Officer Conley overheard

the individuals refuse medical help from an EMT, but he did not get close enough to observe

whether the individuals had visible injuries. (Id. at 410.)



*Image from People's Exhibit 6 shows Petitioner being pulled away from JD Shaved Head.*

Petitioner walked away from the scene with the other Proud Boys members. As

Petitioner walked away, he exclaimed that he "had one of their fucking heads," and that he had

"ripped that motherfucker's mask off and then fucking hit him right in the head." (Mays: A.556-

5

57.) At the corner of 79th Street and Park Avenue, Petitioner posed with a group of other Proud Boys members for a photograph.

The New York Police Department ("NYPD") investigated the incident and reviewed video footage of the altercation. As part of the investigation, Detective Thomas Mays reviewed video footage taken by individuals who observed the altercation, including the journalist Sandi Bachom, and Proud Boys member Christopher Wright. (Mays: A.500-01, 508-511.) Mays also reviewed surveillance video recorded by security cameras in the area. From the footage, the NYPD identified all of the Proud Boys members who participated in the attack, including Petitioner. On October 22, 2018, Petitioner voluntarily surrendered to police after learning that they were looking for him. A grand jury charged Petitioner for his involvement in the altercation.

**2. Trial**

Petitioner was tried in New York County Supreme Court from August 1 through August 15, 2019 before Justice Mark Dwyer. Petitioner was tried with a co-defendant, fellow Proud Boys member John Kinsman, who had also participated in the altercation. Petitioner and Kinsman were represented at trial by Ronald Hart and Jack Goldberg, respectively.

At trial, the prosecution introduced multiple videos from witnesses and security footage as evidence. The videos depicted the entire altercation from multiple angles. Additionally, Mays testified to his investigation into the incident and Conley testified to his observations on the night of the altercation. The prosecution also introduced testimony from Oren Segal, an expert on extremist and terrorist groups. Segal testified regarding Antifa and the Proud Boys' ideology, background, and existing mutual animosity.

6

Segal testified that people associated with the Antifa movement share the primary

belief that "the only way to prevent [N]azism and fascism from rising in this country, is to

physically confront those that support those ideas [such as the Proud Boys], in the street."

(Segal Tr. at A.195.) Similarly, Segal testified that the Proud Boys are a "sort of group slash

movement" whose members "view themselves as . . . defending conservative values in this

country, but have put a premium on the need to attack physically and confront their opponents

who they view as the left; that is Antifa [and] the left, more broadly." (Id. at A.200.) He

testified that McInnes, the founder of the Proud Boys, "really has made violence . . . one of the

core tenets of the Proud Boys," and publicly directed Proud Boys members to "fight with" any

"Antifa" members that they see. (Id. at A.202.)

Segal also testified that there are four levels of Proud Boys membership. (Id.) An

initiation process is required to be accepted as a member at the first level, which includes

pledging an oath of allegiance to the Proud Boys. (Id. A.203.) To rise to the second level, a

Proud Boys member must "get beat up by" other members while "reciting the names of five

breakfast cereals." (Id.) To rise to the third level, a Proud Boys member must get a "Proud

Boys" tattoo. (Id.) To reach the highest level within the group, a member must "get in a

physical confrontation or get arrested for the cause." (Id.)

On cross-examination, defense counsel questioned Segal as to whether he was aware

that the Proud Boys "expel anyone that they deem to be . . . engaging in racist conduct." (Id. at

A.250.) Segal testified that he was aware that this is a formal policy but that he did not think it

is "always the case" that members engaging in racist conduct are expelled. (Id.) In response to

this line of questioning on cross-examination, the prosecution re-examined Segal and asked him

whether he could speak more to the Proud Boys' expressions regarding race and religion. (*Id.* at A.260.) Segal testified that one of the "key ideological points for the Proud Boys is their opposition to Islam;" and that he views the Proud Boys as "leveraging issues of race and religion to try to attract more followers." (*Id.* at A.260.) For example, Segal testified, McInnes has created a video called "The Top 10 Things I Hate About Jews;" has referred to women as "lazy;" and has referred to the black actress, Jada Pinkett Smith, as well as former president Barack Obama, as "monkeys." (*Id.*) He also testified that he had heard McInnes "use the N word" and do the "Nazi salute." (*Id.* at A.261.)

At the conclusion of the government's case, Petitioner and Kinsman moved for a trial order of dismissal based on insufficient evidence pursuant to CPL § 290.10. The trial court denied those motions. Petitioner and Kinsman then put on their case in chief. Petitioner and Kinsman did not deny their involvement in the altercation but argued that they were justified in using physical force in order to defend themselves and their group against the protesters.

Both Petitioner and Kinsman testified at the trial. Petitioner testified that he had joined the Proud Boys in February 2017 and described the Proud Boys as a "group of blue collar men that love America." (Hare Tr. A.881; A.905.) Petitioner described himself as "an extremely patriotic American." (*Id.* at A.881-82.) Petitioner also described the "four degrees" of Proud Boys membership available and confirmed that in order to reach the fourth and highest degree, a member must have "defended [him]self, or got arrested, during one of our events." (*Id.* at A.886). Petitioner testified that he had become a fourth-degree Proud Boy a week prior to the October 12 altercation. (*Id.* at A.946-47.)

8

Petitioner testified that on the day of the altercation, he was aware that Antifa-associated individuals had made threatening calls to the MRC president and that they left a "manifesto" that threatened violence if the Event moved forward. (*Id.* A.893-94.) Petitioner testified that he was "afraid" of "[b]eing attacked" by "Antifa" at the Event. (*Id.* at A.894.) Petitioner testified that after the event ended and he was walking south on Park Avenue, he looked to his left and saw the Antifa members on 82nd Street walking towards him. (*Id.* at A.906.) He testified that he immediately felt fear and "just started walking towards them" in order "to stop them" and to "protect me and my friends." (*Id.* at A.906-08). Petitioner testified that he clapped his hands to alert his friends to what was going on. (*Id.* at A.908.) Petitioner testified that when he reached JD Ponytail, he tried to take JD Ponytail's mask off because he was aware that Antifa members become "cowards" when "they don't have their mask on." (*Id.* at A.912.) Petitioner testified that he dragged JD Ponytail to the ground and removed JD Ponytail's mask, and then another Proud Boy dragged JD Ponytail to the front of the service entrance, at which point Petitioner "got on top of Ponytail" and "threw a couple of punches" and elbowed JD Ponytail until JD Ponytail stopped fighting back. (*Id.* at A.916.) He also admitted to punching JD Shaved Head in the stomach and kicking her in the shoulder but testified that he did so in order to defend himself from JD Shaved Head. (*Id.* at A.919.)

The defense also presented testimony from Wright, the Proud Boys member who captured cellphone footage of the altercation. Wright testified that the Proud Boys are a racially and ethnically diverse group of men focused on promoting "male comradery." (Wright Tr. A.805). Wright also testified that he did not consider McInnes to be 'acist and that McInnes' commentary style was satirical. (*Id.* at A.808-10). During cross-examination, the government

asked Wright if he considered funny certain comments McInnes had made in the past, such as

when McInnes referred to "gay people as fags and deviants," or when he referred to President

Obama as his "favorite monkey," and Wright testified that he did find these comments funny in

the right context. (*Id.* at A.848-51). The defense also admitted into evidence a video taken by

the journalist Paul Miller of individuals leaving the MRC following the Event. The video

captured a protestor telling Miller that he would "knock" Miller out. JD Ponytail and JD Shaved

Head are visible in the crowd in the video.[3]

At the conclusion of the defense case, the trial court instructed the jury as to the crimes

Petitioner and Kinsman were being charged with. The court explained that Petitioner and

Kinsman were asserting a defense of justification, and accordingly it was the government's

burden to prove that their participation in the fight was unjustified. The court explained that a

defendants' participation is "justified" if the defendant "honestly believed that it was necessary

to defend himself or someone else, with either deadly physical force or physical force, from

what he honestly believed to be the use or imminent use of deadly physical force or physical

force, and a reasonable person in defendant's position, knowing what the defendant knew, and

being in the same circumstances, would have believed that also." (A. 1390-98.) The court then

listed four exceptions to the justification defense, namely – if the defendant: (i) is the "initial

aggressor;" (ii) knew that he could safely avoid violence by "retreating;" or (iii) "provoked" the

---

[3]  Petitioner's brief in support of the Petition ("Br.") argues that this video is important because JD Shaved Head
and JD Ponytail can be seen in the video, and he states that this "video was erroneously excluded from evidence
and further denied Appellants a fair trial." (Br. 9.) However, the video was not excluded from evidence, and in
any event is of limited relevance to Petitioner's case. (*See* A.1204.)

violent situation; or (iv) if the altercation "was the product of a combat by agreement, explicit or tacit, that was not specifically authorized by law." (A. 1385-1403.)

During their deliberations, the jury sent a note requesting clarification on the meanings of "physical injury" and "serious physical injury." Judge Dwyer read the jury the legal definitions of these terms as defined in the New York Penal Law ("NYPL") and stated that there was "no legal clarification possible because the law considers those to be just English language words, that should have their own English language meaning." (A. 1437.) He instructed the jury that they would have to "decide in sort of an abstract way" if the defendants intended an injury that satisfies the definitions as had been read to them. (A. 1437-38.)

Additionally, during their deliberations, the jury submitted a note asking whether there exist "other levels of Gang Assault, (Attempted)." The trial court replied, "As to whether there is a lesser Gang Assault, other level of Gang Assault, attempted, there is not. There are no other levels of Attempted Gang Assault that could conceivably apply in this case. So the answer is just [to] follow the instructions on the verdict sheet." (A. 1430, 1436).

After the conclusion of the trial, Petitioner was convicted of one count of attempted gang assault in the first degree for his attack on JD Ponytail; one count of attempted assault in the second degree for his attack on JD Shaved Head, one count of riot in the second degree, and two counts of attempted assault in the third degree for his attacks on JD Ponytail and JD Shaved Head. The jury convicted Kinsman of one count of attempted first-degree assault but acquitted him of two counts of attempted third-degree assault, finding that Kinsman was justified in some of his acts of violence. (A.1450-57).

11

Petitioner timely moved pursuant to N.Y. C.P.L. § 330 to set aside the convictions, and the trial court denied that motion. The Court sentenced Petitioner to an aggregate term of four years, which Petitioner is serving at Gouverneur Correctional Facility in New York.

**3. Direct Appeal**

On July 10, 2020, Petitioner and Kinsman filed a joint appeal of their convictions with the Appellate Division. Petitioner argued that (i) his attempted assault convictions were against the weight of the evidence and were based on legally insufficient evidence, (ii) the jury instructions were improper, and (iii) the trial court erroneously admitted inflammatory testimony regarding McInnes. On February 16, 2021, the Appellate Division unanimously affirmed the convictions and held that "overwhelming evidence" supported the convictions, including that Petitioner and Kinsman "admitted to punching and kicking the victims," "video footage captured virtually all of the conduct at issue," and the "requisite levels of intent could be readily inferred from [their] conduct." *Kinsman*, 191 A.D.3d at 539. The court further held that the evidence "overwhelmingly disproved" Petitioner's "justification defense." *Id.*

The Appellate Division held that Petitioner's claim regarding the inflammatory testimony was procedurally barred because, although Petitioner objected "to the court's general ruling that permitted the expert to be called," he and Kinsman "failed to preserve their specific objections" to "particular portions of the expert's testimony," or to "related portions of the People's cross-examination of defense witnesses." *Id.* In the alternative, the Appellate Division found this claim meritless, holding that the trial court "providently exercised its discretion" in allowing "[s]ome background information regarding the ideology and past conduct of the Proud Boys" to "explain the preexisting animosity between the Proud Boys and

12

Antifa." *Id.* The Appellate Division also noted that to the extent any testimony was prejudicial, the trial court had "issued a limiting instruction" that the background information "was not proof" of Petitioner's and Kinsman's "mental states," and in any event any improper testimony was "harmless" because the proof of Petitioner's guilt was "overwhelming, and there was no significant probability" of an acquittal "had the error not occurred." *Id.*

Lastly, the Appellate Division held that the court's jury instructions "do not warrant reversal" because the instructions "generally followed the Criminal Jury Instructions, and the court correctly stated the law to the extent it supplemented those pattern instructions at times in its meaningful responses to the jury's notes." *Id.*

Petitioner and Kinsman applied for leave to appeal to the New York Court of Appeals. In a joint leave letter, Petitioner and Kinsman asked the Court of Appeals to review (i) the Appellate Division's harmless error analysis—which pertained to their claim that the trial court improperly admitted inflammatory testimony; (ii) the Appellate Division's conclusion that the trial evidence warranted a combat-by-agreement instruction; and (iii) the Appellate Division's weight-of-the-evidence analysis. The letter did not assert any constitutional claims or refer to the other contentions raised in their briefs to the Appellate Division. The New York Court of Appeals denied Petitioner and Kinsman's leave application on April 29, 2021.

## 4. The Instant Petition for Writ of Habeas Corpus

On April 19, 2022, Petitioner timely filed a Petition seeking release from custody pursuant to 28 U.S.C. § 2254. (ECF No. 1 ("Pet.").) The following day, Petitioner filed a memorandum of law in support of the Petition. (ECF No. 4 ("Br.").) On April 22, 2022, Petitioner re-filed the Petition with exhibits because Petitioner had inadvertently omitted the

exhibits from the initial filing. (ECF No. 14.) On April 25, 2022, Kinsman also filed a habeas

petition, which is before the Honorable Paul G. Gardephe, and has been referred to the

Honorable Stewart D. Aaron for a Report and Recommendation. *Kinsman v. Rawson*, 22-cv-

3338 (PGG) (SDA).

Petitioner asserts five grounds for habeas relief.  First, he argues that the trial court

violated his right to a fair trial by admitting inflammatory testimony regarding McInnes'

"controversial" statements.  (Pet. 5; Br. 15-21.)  Second, he asserts that the trial court erred by

including a "combat by agreement" charge in the jury instructions.  (Pet. 7; Br. 21-24.)  Third,

Petitioner challenges the sufficiency of the evidence to support his attempted assault

convictions.  (Pet. 8; Br. 2.)[4]  Fourth, he asserts that the trial court erred in its response to two

jury notes, namely the note requesting clarification as to the definition of physical injury, and

the note requesting to know whether there is a "lesser version" of attempted first degree gang

assault.  (Pet. 10; Br. 25-28.)  Fifth, the brief argues that remarks made by two Justices of the

Appellate Division during oral argument on the direct appeal showed that the Justices

misunderstood certain facts and thus denied Petitioner fair appellate review.  (Br. 28.)

## LEGAL STANDARDS

### 1.  Legal Framework under 28 U.S.C. § 2254

Federal courts are authorized to issue habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act

---

[4] The Petition also appears to assert a claim that the convictions were against the weight of the evidence, but Petitioner disclaims this argument in his reply brief and states that he is "aware" that such a claim is "not subject to habeas corpus review[]." (Reply 17.)  Indeed, an argument that a conviction is against the weight of the evidence is a state law claim that is "not cognizable" on habeas review. *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011).

14

of 1996 (AEDPA). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). A state prisoner can obtain

federal habeas relief only by showing that the state court's decision on the merits was either

"contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court," or based on an unreasonable determination of the facts

presented to the state court. 28 U.S.C. § 2254(d)(1)-(2).

"To be 'contrary to' clearly established law, a state court must reach a conclusion of law

antithetical to a conclusion of law by the Supreme Court, or decide a case differently than the

Supreme Court has when the two cases have 'materially indistinguishable facts.'" *Rosario*

*v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010) (citation omitted). In the AEDPA context, "clearly

established" law refers to "only the holdings, as opposed to the dicta," of the Supreme Court's

decisions. *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quotation marks and citation

omitted). Once the clearly established Supreme Court holding has been distilled, an

"unreasonable application" of the holding "must be objectively unreasonable, not merely

wrong, even clear error will not suffice." *Id.* If a state court decision does not elaborate on its

reasoning, the federal court should look to the last recorded state decision that provides

rationale. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## 2. Exhaustion and Procedural Default

Prior to seeking federal habeas review, a state prisoner must exhaust all remedies

available in state court. 28 U.S.C. 2254(b)(1)(A); *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir.

2014). A petitioner "must give the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the State's established appellate

review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This requires the petitioner

to present the "essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson*, 763 F.3d at 133 (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)). The federal constitutional nature of the claims must be explicitly presented to the state courts in the first instance. *Id.* at 132-33; *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).

When a petition presents an unexhausted claim, the court must determine whether the petitioner can return to state court to exhaust the claim. *Jackson*, at 133. If the claim is unexhausted and the petitioner cannot obtain further review of the claim in state court, the federal court must deem the claim procedurally defaulted. *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991); *Weston v. Capra*, 2022 WL 1811161, at *9 (S.D.N.Y. Apr. 13, 2022), *report and recommendation adopted*, 2022 WL 2914506 (S.D.N.Y. July 25, 2022), *appeal dismissed*, 2022 WL 18207319 (2d Cir. Dec. 15, 2022), *cert. denied*, 215 L. Ed. 2d 78, 143 S. Ct. 831 (2023).

Additionally, federal habeas corpus review of a state court's denial of a federal constitutional claim is barred if the state court's decision rests on an independent and adequate state procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

There are two exceptions that permit a federal court to review a claim that is procedurally defaulted or that is barred for having been resolved on an independent and adequate state ground. Such a claim "may be raised in habeas only if the [petitioner] can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998) (quotation marks and citations omitted). To demonstrate cause, the petitioner must show "some objective factor external to the defense." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). "[A]ctual prejudice" requires a showing of

16

"substantial disadvantage" that infected the entire trial "with error of constitutional

dimensions." *Id.* (citation omitted). "A miscarriage of justice occurs 'in an extraordinary case,

where a constitutional violation has probably resulted in the conviction of one who is actually

innocent.'" *Id.* (citation omitted). To establish actual innocence, the petitioner must show that

"'in light of all the evidence,' 'it is more likely than not that no reasonable juror would have

convicted him.'" *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (citation omitted).

## DISCUSSION

For the reasons discussed below, each of Petitioner's claims should be dismissed as

procedurally barred or in the alternative as meritless.

### 1. Petitioner's Claims Are Procedurally Barred Because They Were Not Raised to the Court of Appeals

All of Petitioner's claims for habeas review are procedurally barred because they were

not presented to the Court of Appeals. The claims are therefore not exhausted, and Petitioner

would not be afforded another opportunity to exhaust the claims.

Petitioner raised four of his habeas claims to the Appellate Division on direct appeal,

namely (i) that Petitioner was denied a fair trial due to the admission of inflammatory

testimony; (ii) that the trial court's "combat by agreement" charge violated due process;

(iii) that the evidence was legally insufficient; and (iv) that the trial court's response to two jury

notes violated due process. However, Petitioner omitted these claims from his letter to the

Court of Appeals seeking leave to appeal. Petitioner's letter to the Court of Appeals focused on

three narrow arguments, all of which were based on state law. The letter asked the Court of

Appeals to review the Appellate Division's (i) harmless error analysis; (ii) its conclusion that the

trial evidence warranted a combat-by-agreement instruction; and (iii) its weight-of-the-

evidence analysis. The letter also argued that the Appellate Division had misunderstood certain

facts, but the letter did not couch this argument in constitutional terms. Indeed, Petitioner's

letter to the Court of Appeals did not explicitly assert *any* constitutional claims, and did not

refer to the constitutional arguments raised in the Appellate Division briefing.[5]   Petitioner's

letter to the Court of Appeals was thus insufficient to put that court on notice that he was

asking it to review any claim based on the Constitution. *Grey*, 933 F.2d at 120.   Accordingly,

these claims are unexhausted. *Id.* (habeas petitioner failed to exhaust constitutional claims not

explicitly mentioned in his application for leave to appeal).

Petitioner argues that his letter application to the Court of Appeals "should be broadly

construed to include all his federal claims" that were included in the brief presented to the

Appellate Division, because Petitioner attached his appellate brief to his letter to the Court of

Appeals. (Reply 18.)   In *Grey*, the Second Circuit rejected this precise argument, reasoning that

the "fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the

Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one

of them, was that the other two had been abandoned."   933 F.2d at 120.   The Court explained

that even though the petitioner in *Grey* had included "a lengthy brief originally submitted to

another court," the Court of Appeals was not required "to look for a needle in a paper

haystack."   *Id.* (citations omitted).

Petitioner's cited case, *Galdamez v. Keane*, 394 F.3d 68 (2d Cir. 2005), is easily

distinguished.   There, the petitioner's letter to the Court of Appeals did not specify *any* claims,

---

[5] Although Petitioner mentioned his combat-by-agreement argument in his letter to the Court of Appeals as a matter of state law, he did not explicitly assert any federal constitutional claims based on the combat-by-agreement instruction.

but "simply enclosed a copy of the Appellate Division's decision affirming the conviction, and stated that '[t]he appellant hereby requests leave to appeal to this Court.'" *Id.* at 75. The letter attached the briefs that the petitioner had submitted to the Appellate Division. *Id.* The Second Circuit distinguished the facts in *Galdamez* from those in *Grey*, wherein "the petitioner's leave application had affirmatively directed the Court of Appeal's attention away from claims contained in the attached briefs." *Id.* The Court reasoned that unlike in *Grey*, Galdamez's letter seeking leave to appeal did not communicate to the Court of Appeals that it should focus on some claims to the exclusion of others, and thus it would be reasonable to assume the Court of Appeals would construe the petitioner's application "as a request for review of all of the issues outlined in the briefs." *Id.* at 77.

The facts in this case are akin to those in *Grey* and unlike those in *Galdamez*. Petitioner's letter to the Court of Appeals specified particular claims for the Court of Appeals to review, and thus directed the Court of Appeals' attention away from the claims not included in Petitioner's letter. As such, Petitioner's letter did "not fairly apprise" the Court of Appeals of the constitutional claims, *Grey*, 933 F.2d at 120, and these claims are unexhausted.

The opportunity for Petitioner to present his constitutional claims to the Court of Appeals has now passed, and Petitioner would be barred from returning to state court to exhaust the claims because he has already made the one request for leave to appeal to which he is entitled. Accordingly, these claims are procedurally defaulted. *Id.* at 121.

In addition, Petitioner's claim regarding inflammatory testimony introduced at trial regarding McInnes is procedurally barred for a separate reason: this claim was rejected by the Appellate Division based on Petitioner's failure to comply with New York's "contemporaneous

objection" requirement because Petitioner failed to raise a contemporaneous objection to the allegedly inflammatory testimony during trial, as required under New York law. *Kinsman*, 191 A.D.3d at 541. It is well established that New York's rule requiring a contemporaneous objection is an adequate and independent state law ground sufficient to bar habeas review. *Whitley v. Ercole*, 642 F.3d 278, 286-87 (2d Cir. 2011).

It is the petitioner's burden to demonstrate that an exception applies to the procedural bars. *Wainwright v. Sykes*, 433 U.S. 72, 91 (1977). As discussed above, a petitioner can do this by showing cause for the procedural default and prejudice resulting therefrom, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Id.* Here, Petitioner has not demonstrated the application of either exception.

To start, Petitioner has not established cause for the procedural default because he has not pointed to any objective factor external to the defense that impeded his efforts to comply with the proper procedures. Petitioner was represented by counsel throughout trial and his appeals, and remains represented by counsel here, yet despite submitting a lengthy memorandum of law in support of his Petition and a 175-page reply, Petitioner has not identified *any* factor that explains his failure to raise his constitutional claims to the Court of Appeals, nor has he identified *any* factor that explains his failure to contemporaneously object to the controversial testimony at trial. Accordingly, Petitioner has not shown cause for the procedural default. Where a petitioner is unable to show cause, "the court need not consider actual prejudice." *McCleskey v. Zant*, 499 U.S. 467, 502 (1991). Regardless, Petitioner cannot show prejudice because, as discussed below, Petitioner's claims are meritless.

Petitioner also has not established that failure to consider the claims will result in a "fundamental miscarriage of justice," because he has not come forward with reliable evidence of his innocence that was not presented at trial. *Calderon v. Thompson*, 523 U.S. 538, 559-60 (1998). Petitioner has not presented any new evidence to demonstrate innocence, and instead repeats the same argument he made at trial – specifically that his participation in the fight was justified. The jury already rejected the applicability of the justification defense. As such, Petitioner has not shown that the miscarriage of justice exception applies here.

Because Petitioner's claims are procedurally defaulted, this Court is foreclosed from reviewing the claims, and I respectfully recommend the Petition be denied on this basis.

## 2. Petitioner's Claims are Also Meritless.

Although I recommend that the Petition be denied in its entirety as procedurally barred, even if some or all of Petitioner's claims were found not to be procedurally defaulted, the claims should be dismissed in the alternative as failing on the merits.

### a. Testimony regarding controversial statements

Petitioner asserts he was denied a fair trial due to the admission of testimony by Segal on re-direct, and Wright on cross-examination, regarding "hate speech" attributed to McInnes. (Pet. 5.) For example, Segal testified that he had heard McInnes use "the N-word" and do the "Nazi salute," and Wright testified that he had heard McInnes refer to "Latinos as having no jobs and no fathers," and to "gay people as fags and deviants." (Br. 6-7.) Segal's testimony was elicited on re-direct in response to questioning by defense counsel regarding whether Segal was aware that the Proud Boys did not tolerate racism within the group. Wright's testimony was elicited on cross-examination in response to Wright's testimony on direct examination that

21

McInnes' controversial statements were meant to be ironic or satirical. Petitioner argues that this testimony was "highly inflammatory, prejudicial, and utterly irrelevant," and that but for the testimony, no rational jury would have convicted Petitioner. (Br. 15.) The Appellate Division rejected the argument as procedurally barred and, in the alternative, as meritless, and explained that to the extent certain statements were prejudicial, any error was harmless in light of the overwhelming evidence of Petitioner's guilt. *Id.*

A state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA. *Brown v. Davenport*, 142 S. Ct. 1510, 1520 (2022). A federal habeas court reviews a state court's determination of harmless error under a two-part standard. First, the court applies the test laid out in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which requires the petitioner to show that a trial error had a "substantial and injurious" effect or influence on the jury's verdict. Second, the court applies the AEDPA standard laid out in § 2254(d)(1), which requires the petitioner to show that the state court's harmless error determination was an unreasonable application of federal law as determined by the Supreme Court.

Petitioner does not satisfy the *Brecht* standard, and therefore even without reaching the AEDPA standard, his claim fails. "In assessing whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision, [this Court] consider[s] the importance of the wrongly admitted evidence, and the overall strength of the prosecution's case." *Krivoi v. Chappius*, 2022 WL 17481816, at *3 (2d Cir. Dec. 7, 2022) (citing *Wood v. Ercole*, 644 F.3d 83, 94 (2d Cir. 2011)). Here, the evidence at issue was of limited importance, and in fact was only admitted in response to testimony elicited by defense counsel regarding Proud Boys purportedly inclusive practices. The statements concerned an individual who was not a

22

defendant at trial, and Petitioner himself testified as to his own beliefs, including that he is not a racist, and that the Proud Boys are "[j]ust a group of blue collar men that love America." (Hare Tr. A.881, A.1064-65.) Moreover, the trial court warned the jurors that their "job [was] not to decide whether [they] like[d] or dislike[d] any group or person based on politics" (A.1346), thus limiting any importance the jury might have placed on this testimony. As to the strength of the government's case, there was ample evidence of Petitioner's guilt, including his own testimony as to his involvement in the altercation, and numerous videos and photographs depicting the altercation. Petitioner's sole defense was that his actions were justified, but as discussed in more detail below, the evidence was sufficient to rebut that defense. The prosecution's case was well-supported even without the prejudicial statements, and the jury's decision would likely have been the same even without that testimony.

Petitioner also fails to satisfy the AEDPA standard, because he has not shown that the Appellate Division decision was contrary to any Supreme Court decision. Rather, having reviewed the trial transcripts and reviewed the video evidence presented to the jury, this Court agrees with the Appellate Division's reasonable conclusion that overwhelming evidence supported the convictions. Petitioner's cited cases do not change the Court's analysis, because those cases involved vastly different facts, and they are not decisions from the U.S. Supreme Court. To start, *United States v. Bugros*, which is a non-habeas Second Circuit case cited by Petitioner, involved a statement made repeatedly by a prosecutor against the judge's explicit ruling, and was made for the sole purpose of suggesting that the deferdant was a contemptible person. 304 F.2d 177 (2d Cir. 1962). By contrast, here, the statements were made by witnesses with the trial court's permission in an effort to provide background regarding the mutual

animosity between the Proud Boys and Antifa. Similarly, *United States ex rel. Haynes v. McKendrick*, also cited by Petitioner, involved racist remarks by the prosecutor about the black defendant on summation to an all-white jury, including that the "colored race" is "weak[]" and unable "to do certain things that maybe are commonplace for the ordinary person." 481 F.2d 152 (2d Cir. 1973). This is a far cry from the testimony in this case by witnesses recounting statements made by a non-party. Moreover, in that case, the evidence of guilt rested on an ambiguous eyewitness identification, whereas the evidence here included Petitioner's own admissions of his involvement in the altercation.

Accordingly, while I recommend that the Court dismiss Petitioner's claim as to the inflammatory testimony as procedurally barred, in the event the Court considers the claim on the merits, I recommend it be dismissed as meritless.

### b. Trial Court's Combat-By-Agreement Jury Instruction

Petitioner asserts that the trial court erred by including a "combat by agreement" charge in the jury instructions because, he argues, there was no evidence presented at trial to support that an agreement existed between him and the other individuals engaged in the altercation. He argues that in presenting this instruction to the jury, the trial court "deprived" Petitioner of his justification defense. (Br. 23.) Petitioner presented this claim on his direct appeal, and the Appellate Division rejected it on the merits, finding that the court's jury instructions were appropriate. *Kinsman*, 191 A.D.3d at 540.

Even if this claim were not procedurally barred, it would fail on the merits. A petitioner raising a claim about jury instructions for habeas relief must show not only that the instructions violated a right guaranteed by the Fourteenth Amendment, but also that the error "so infected

the entire trial that the resulting conviction violates due process." *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001) (internal citations omitted). Petitioner has shown neither element here.

First, Petitioner has not shown that the trial court erred in instructing the jury on the "combat by agreement" exception to a justification defense. Although there was no evidence that Petitioner *explicitly* agreed ahead of time with JD Shaved Head and JD Ponytail to fight after the MRC event, a "combat by agreement" can be "tacit." *People v. Agosto*, 203 A.D.3d 841 (2d Dep't 2022), *leave to appeal denied*, 38 N.Y.3d 1068 (2022); *see also United States v. Curry*, 542 F. Supp. 3d 197, 200, 205 (W.D.N.Y. 2021) (finding combat-by-agreement instruction appropriate where evidence supported the conclusion that the defendant and victim "were members of warring gangs who 'tacitly agreed' to a shoot-on-sight rivalry"); *People v. Young*, 33 A.D.3d 1120, 1124 (3d Dep't 2006) (combat by agreement can be shown by evidence that the "defendant and the victim were members of 'rival groups that tacitly agreed, pursuant to an unwritten code of [ ] honor, that there would be mutual combat.'").

Here, the evidence supported a finding that a tacit agreement existed between the Proud Boys members on the one hand, including Petitioner, and the Antifa protestors on the other, including JD Ponytail and JD Shaved Head, to fight following the MRC Event. Such evidence included Segal's testimony regarding the existing animosity between Antifa and the Proud Boys and recounting a history of violent altercations between the groups, and his testimony that each group explicitly endorsed the use of violence against the other, including at and following events hosted by or attended by the opposing group. (Segal Tr. A.197, 201-02, 210.) Indeed, Segal testified that the use of violence against the opposing group is one of the core principles of both Antifa and the Proud Boys; that individuals affiliated with Antifa will

25

"show up at rallies, protests, [and] events" hosted by opposing groups and will "try to find ways to engage in physical confrontations;" and that members of the Proud Boys similarly "promote the notion of beating back an[d] opposing Antifa . . . through physical confrontation," and that they are encouraged to use physical violence against "the Antifa" if they see such individuals at an event. (*Id.* at A.195-97, 200-02.) Additionally, both Segal and Petitioner testified that Proud Members must get in a physical confrontation or "get arrested for the cause" in order to reach the highest level of Proud Boys membership.

In addition to Segal's testimony, the defense presented evidence that members of Antifa had explicitly threatened violence following the MRC Event, including through a "Manifesto" left outside the MRC on the day of the Event. Petitioner also testified that he and a group of other Proud Boys members were aware of this threat of violence before attending the event, and that they discussed the threat at a bar before going to the event together. Petitioner testified that he attended the MRC Event with the understanding that he and his fellow Proud Boys "were gonna be attacked," but that he attended the event anyway, wearing a new pair of heavy-duty boots. (Hare Tr. A.895.) In addition, Petitioner admitted that as he entered the MRC, he yelled to the protestors that he would see them after the event in "the parking lot," which could be interpreted as a call to fight after the event. (*Id.* at A.962.) Petitioner also testified that "both sides" were taunting each other as Proud Boys members entered the Event. (*Id.* at A.965.) Moreover, the possibility of violence following the event was obvious to the NYPD, which had arranged for officers to attend the event and direct foot traffic in an effort to avoid physical confrontation between the two groups.

This case is distinguishable from *People v. Anderson*, which Petitioner cites in support of

his argument on this point. 180 A.D.3d 923, (2d Dept. 2020), *aff'd*, 36 N.Y.3d 1109 (2021). In

*Anderson*, the court found that the combat-by-agreement instruction was given based only on

"generalized evidence" that the defendant and victims were affiliated with rival gangs, but

there was no evidence supporting any "agreements to combat between specific individuals or

small groups on discrete occasions." *Id.* Here, the evidence went beyond mere generalized

evidence that Petitioner and the protestors were members of rival groups. Rather, the

evidence at least arguably supported a finding that a specific, tacit agreement existed between

the Proud Boys members who attended the Event on the one hand, and the Antifa-affiliated

individuals who showed up to protest the event on the other, to fight following the Event.[6]

In any event, even if the evidence did not support the trial-by-combat instruction,

Petitioner has not shown that the instruction "infected" the trial so as to deprive him of due

process, because there was significant evidence at trial to negate Petitioner's justification

defense. *See Anderson*, 180 A.D.3d at 924 (finding the combat-by-agreement instruction was

harmless error because there was overwhelming evidence that the defendant was the initial

aggressor). Here, even if the evidence did not support the combat-by-agreement exception,

the evidence supported other exceptions to the justification defense, including that Plaintiff

was the initial aggressor (evidence showed Plaintiff ran toward the protestors and threw the

first punch); and that Petitioner could have safely retreated (evidence showed that Petitioner

---

[6] The other cases to which Petitioner cites on this point are inapposite, because in those cases the court declined
to charge the jury as to the justification defense where evidence supported that the jury charge should have
been given. *See Davis*, 270 F.3d at 123; *Rodriguez v. Heath*, 138 F. Supp. 3d 237 (E.D.N.Y. 2015). Here, the trial
court charged the jury as to the justification defense, and reasonably also instructed the jury as to the
exceptions to that defense.

was 100 feet away from the protestors when he first saw them, on a busy street that was actively patrolled by police; that after the fight broke out, the Proud Boys outnumbered the protestors; and that Petitioner attacked both JD Ponytail and JD Shaved Head when those individuals were lying and sitting on the ground, respectively, and were not fighting back).

Moreover, the evidence also supported a finding that Petitioner did not honestly and reasonably believe that it was necessary to defend himself from what he honestly and reasonably believed to be the use or imminent use of physical force. Indeed, the evidence showed that the protestors were almost a full avenue away from Petitioner and his group when he allegedly feared the imminent use of physical force. A jury could reasonably have found that that fear was not honest, or not reasonable. In other words, the jury could have reasonably found that Petitioner was not justified in his use of force without even reaching the question of whether an exception to the justification defense applied. *Id.*; *see also Haynes v. Att'y Gen. of New York*, 2023 WL 2021056, at \*9 (E.D.N.Y. Feb. 15, 2023) (finding that even if the instruction was given in error, the error was harmless in light of the evidence supporting the conviction).

Therefore, in the event the Court considers this claim on the merits, I recommend it be dismissed as meritless.

### c. Sufficiency of the Evidence

Petitioner asserts that the evidence at trial was legally insufficient to support a conviction for attempted first-degree gang assault, attempted second degree assault, and attempted third-degree assault. (Pet. 9).[7] Petitioner argues that there was no evidence

---

[7] Petitioner does not appear to challenge the sufficiency of the evidence to support the attempted second-degree riot conviction, nor could he, since he made no challenge to the legal sufficiency of the evidence as to this conviction on direct appeal, and accordingly the claim is unexhausted.

showing injury to JD Ponytail and JD Shaved Head, and accordingly the prosecution could not establish intent to cause physical injury, and that the evidence was insufficient to rebut his defense of justification. On direct appeal, the Appellate Division rejected this claim on the merits, finding that the verdict was based on not only sufficient, but "overwhelming" evidence. *Kinsman*, 191 A.D.3d at 539. The Appellate Division noted that the "case involved an attack by defendants' political group. . . [on] an opposing political group;" that "Defendants admitted to punching and kicking the victims;" and that "video footage captured virtually all of the conduct at issue." *Id.* The court explained that "[t]he requisite levels of intent could be readily inferred from defendants' conduct, and, likewise, the evidence overwhelmingly disproved their justification defense." *Id.* The Appellate Division explained that because the convictions were all for attempted rather than completed crimes, they "did not require proof of injury." *Id.*

Even assuming Petitioner's evidentiary sufficiency claims were not procedurally barred, they are meritless. An evidentiary sufficiency claim faces a "high bar" in federal habeas proceedings and is subject to "two layers of judicial deference." First, the court defers to the fact finder's broad discretion to decide the case, and second, the court defers to the state court's decision, which should not be overturned unless it is "objectively unreasonable." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). Evidence is legally sufficient if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 309, 319 (1979). The court must make all inferences in the prosecution's favor and look to state law to determine the elements of the crime. *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000).

Petitioner has not met the high bar here as to any of his convictions. For the first-degree gang assault conviction, the evidence must show that the defendant intentionally attempted to cause serious physical injury to another person when aided by two or more other persons actually present. NYPL §§ 110.00/120.07. To support a charge for attempted second-degree assault, the evidence must show that the defendant intentionally attempted to cause physical injury to another person using "a deadly weapon or dangerous instrument." *Id.* § 120.05(2). As for the attempted third-degree assault charge, the evidence only needs to show that a defendant intended to inflict physical injury on someone and attempted to cause that injury. *Id.* § 110.120.00. In addition, for all of these convictions, because Petitioner raised the justification defense, the prosecution had to prove beyond a reasonable doubt that Petitioner's actions were not justified. *Id.* §§ 25.00(1), 35.00. A defendant can only rely on the justification defense if he reasonably believed that the victim was using, or was about to use, physical force against him, and where no exceptions to the defense apply. *Id.* § 35.15(1). As discussed above, exceptions include where the defendant was the "initial aggressor," where the defendant had the opportunity to safely retreat, or where the force was used pursuant to a "combat by agreement" not authorized by law. *Id.*

The government presented sufficient evidence at trial to meet every element necessary for each conviction. Petitioner was convicted of first-degree gang assault for beating JD Ponytail. The video evidence showed Petitioner walk toward the group of protestors and then grab, punch, and beat JD Ponytail while another Proud Boys member held JD Ponytail on the ground, and while other Proud Boys members were aiding in the altercation by beating other Antifa-affiliated protestors and by looking on. Petitioner's intent to seriously injure JD Ponytail

is easily inferred from the evidence showing him holding JD Ponytail against the concrete sidewalk and hitting him.[8]

Petitioner argues that a person cannot have the requisite intent to cause serious physical injury unless they are using an "inherently . . . deadly" weapon such as a gun. (Br. 10-11.) However, it is well established that a person can intend to cause serious physical injury even if they are unarmed. *See, e.g.*, *People v. Peralta*, 1 A.D.3d 115, (1st Dep't 2003) (petitioner's intent to cause serious injury could be discerned from the evidence that he punched and kicked the victim multiple times); *Coke v. Superintendent, Green Haven Corr. Facility*, 2010 WL 475274 at *3 (W.D.N.Y. Feb. 5, 2010) (evidence that petitioner hit the victim with a belt was sufficient to prove his intent to seriously injure the victim). The Appellate Division reasonably held that the evidence was sufficient here for the jury to infer the requisite level of intent.

As discussed above, the video and testimonial evidence at trial also supported a finding that Petitioner's actions were not justified as to this charge. To start, the videos showed that JD Ponytail was over 100 feet away from Petitioner at the moment Petitioner chose to walk briskly toward him rather than away from him. Given that Petitioner was on a busy, police-patrolled street, a juror could reasonably find that Petitioner did not honestly or reasonably believe that he and his group were in imminent danger, or that he could have safely retreated from anticipated use of force.

---

[8] Petitioner's brief also argues that the Assistant District Attorney gave a "confusing" example of attempt to cause serious physical injury during the summation, (Br. 10-11) but he does not appear to argue that this itself is a basis for habeas relief, nor could he, because Petitioner did not raise this argument before the state court.

31

As to the attempted second-degree assault conviction, this conviction was based on Petitioner's attack on JD Shaved Head. The evidence showed that Petitioner punched JD Shaved Head and kicked her with his hard boot while she was sitting on the ground covering her head. It is well established that a boot can qualify as a "dangerous weapon" for the purpose of such a conviction. *See, e.g., People v. English*, 118 A.D.3d 558, 558 (1st Dept 2014) (boots qualified as dangerous instrument where defendants kicked the victim). The intent to cause physical injury to JD Shaved Head was readily inferable from the evidence showing the repeated punching and kicking to a woman who had already received a substantial beating from other Proud Boys. The evidence also supported a finding that Petitioner was not justified in attacking JD Shaved Head. The videos showed that JD Shaved Head was sitting on the floor and covering her face, that other Proud Boys members were also beating her while others looked on, and that Petitioner had to be pulled away from JD Shaved Head by another Proud Boys member, suggesting that it was unreasonable for Petitioner to believe the continued use of force was necessary to protect himself or others.

As to the attempted third-degree assault convictions, these were based on Petitioner's attacks on both JD Ponytail and JD Shaved Head. Petitioner does not meaningfully challenge the attempted third-degree assault convictions in his memorandum of law, and even concedes that the evidence "at most" supported these convictions. (Br. 13.) Indeed, for the same reasons discussed above, the evidence easily supported a finding that Petitioner intended to inflict physical injury on JD Ponytail and JD Shaved Head and attempted to cause that injury.

In his brief, Petitioner makes much ado over evidence that unidentified Antifa-affiliated individuals made threats of violence directed at the MRC president in advance of the Event and

called for the Event to be cancelled.  He argues that such evidence "showcase[s]" the Antifa members' "motive and intent to attack the Proud Boys," and that Petitioner was therefore "blameless."  (Br. 11.)  However, the fact that some individuals made threats of violence hours prior to the altercation is not sufficient to show that Petitioner was justified in his use of force in the moment, or that an exception to the justification defense did not apply.  *See Brown v. Artuz*, 124 F.3d 73, 80-81 (2d Cir. 1997) (evidence that the victim had threatened the defendant's life, had a tempter, and had perpetrated acts of violence on others would not have supported a justification defense because it would have been insufficient to support a reasonable inference that the defendant could not have retreated).[9]

Finally, Petitioner argues that the evidence was insufficient to support the convictions because the government did not prove that JD Ponytail and JD Shaved Head were injured. Petitioner acknowledges that he was convicted only for attempted crimes, but he nevertheless argues that these attempt charges "require some sort of objective injury[,] however slight." (Reply 22.)  This assertion is simply incorrect.  As each charge was for attempt, there was no requirement for the government to prove that an injury was incurred.  *See People v. Coleman*, 151 A.D.3d 1385, 1386 (3d Dept. 2017) ("defendant's intent to cause serious physical injury, and not whether such injury actually resulted," was the only relevant consideration in assessing legal sufficiency of conviction for attempted first-degree gang assault).  In any event, although

---

[9] Petitioner's memorandum of law also briefly asserts that the verdict was "inconsistent" to the extent Kinsman was found to be justified for his violence toward JD Ponytail whereas Petitioner was not found to be justified. (Br. 26.)  This verdict is not inconsistent since the evidence reflects that unlike Petitioner, Kinsman stepped into the altercation after it had already begun and therefore may have reasonably felt that the use of force was necessary to protect Petitioner and others.

33

irrelevant to the sufficiency question, the circumstantial evidence supports an inference that JD Shaved Head and JD Ponytail were injured as a result of the beating they endured.

Petitioner's cited cases, *People v. Mazariego*, 117 A.D.3d 1082 (2d Dept. 2014), *People v. Madera*, 103 A.D.3d 1197 (4th Dept. 2013), and *People v. Armstrong*, 125 A.D.3d 1493 (4th Dept. 2015), are inapposite because the defendants in those cases were convicted of completed offenses. In *Armstrong*, the Fourth Department held that the trial evidence was insufficient to support a conviction for gang assault in the first degree but was sufficient to support a conviction for attempted gang assault in the first degree where the evidence established that the defendant intended to inflict serious physical injury on the victim, but inflicted only physical injury. However, the mere fact that there was evidence of physical injury in *Armstrong* does not mean that evidence of physical injury is required to establish intent; in other words, evidence of injury may be sufficient, but is not necessary, to establish the requisite intent.

Accordingly, Petitioner has not met his burden to show that the Appellate Division erred in finding the convictions were supported by sufficient evidence, and as an alternative to dismissing these claims as procedurally barred, I recommend that they be denied as meritless.

### d. Trial Court's Responses to Jury Notes

Petitioner claims that the trial Court erred in responding to two jury notes. First, he argues that the trial court's instructions regarding the definition of "physical injury" were incorrect. (Pet. at 11). Second, he argues that the judge improperly responded to a jury note that asked whether there were any lesser versions of the attempted gang assault charge. (Br. 25-28). The Appellate Division rejected both arguments on the merits, concluding that

34

Petitioner's challenges to the trial court's "main and supplemental jury instructions do not warrant reversal." *Kinsman*, 191 A.D.3d at 540. As discussed above, these claims are procedurally defaulted, but in any event, they would fail as meritless.

Under New York law, a trial judge must respond meaningfully to inquiries from a deliberating jury. *People v. Malloy*, 55 N.Y.2d 296, 301 (1982). The sufficiency of a court's supplemental instruction is gauged by the form of the jury's question, the particular issue about which inquiry is made, the response given, and the presence or absence of prejudice to the defendant. *People v. Almodóvar*, 62 N.Y.2d 126, 131-32 (1984). To obtain habeas relief on the basis of an improper response to a jury inquiry, a petitioner must demonstrate that the judge's response "so infected the entire trial that the resulting conviction violates due process." *Urena v. Lape*, 373 F.Supp.2d 449, 458 (S.D.N.Y. 2005). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433 (2004).

Here, Petitioner has not shown that the trial court's responses to the jury's notes were improper. In response to the juror note seeking clarification of the terms "serious physical injury" and "physical injury," the trial court accurately recited the definitions of these terms as provided in the NYPL and correctly stated that the jury would be required to use its judgment to determine whether something was a "physical injury" or "serious physical injury" to the extent the definitions did not provide sufficient guidance.

As to the trial court's response to the juror note asking whether there were "other levels" of attempted gang assault, the trial court's response was substantively correct because there are no lesser versions of attempted gang assault. Although there is a second-degree gang

assault offense, this offense legally cannot be charged as an attempt. *People v. Delacruz*, 177 A.D.3d 541, 542 (1st Dept. 2019). Petitioner argues that the Court should have responded to the jury note by advising the jury that attempted assault in the third degree is a lesser included offense of attempted first degree gang assault, however that fact had already been provided to the jury in the jury charge and was made clear on the verdict sheet. There is no evidence that the jury was confused or uncertain about this point, and there is no basis to find that the trial court erred in failing to clarify this. (A.1277, 1282).

In any event, even assuming that either of the jury instructions were in error, Petitioner has not established that such error amounted to a due process violation. As discussed at length above, the evidence of Petitioner's guilt was overwhelming, and it is not likely that a different result would have been reached absent these instructions. Accordingly, this claim is meritless.

### e. Appellate Division Justices' Remarks

Finally, Petitioner argues that he was denied a fair appellate review because remarks by two justices of the Appellate Division during oral argument demonstrated that the justices misunderstood some of the underlaying facts. (Br. 28-30.) Specifically, Petitioner complains that Justice Webber commented during oral argument that Petitioner had kicked JD Shaved Head multiple times, when in reality, he kicked her only once. He also argues that Justice Kennedy noted that there were "30 Proud Boys present," whereas only approximately ten Proud Boys members participated in the fight, although approximately 30 Proud Boys were present near the scene of the altercation. (Br. 30).

Even assuming this claim were not procedurally barred, the claim does not provide a basis for habeas relief. Oral arguments provide the parties with the opportunity to clarify their

arguments and alleviate any potential factual ambiguities before a decision is issued.

Accordingly, to the extent any justices misunderstood the facts during oral argument,

Petitioner, through his counsel, had the opportunity to remedy those misunderstandings prior

to any decision being issued.  Even if the justices misunderstood some facts during oral

argument, Petitioner has not shown that they misunderstood the facts when issuing a decision,

and indeed, the Appellate Division's decision does not reflect any factual misunderstandings.

*See Kinsman*, 191 A.D.3d at 539-41.

In any event, the alleged factual misunderstandings that Petitioner complains of are

minor and largely irrelevant issues.  There was no legal relevance as to whether Petitioner

kicked JD Shaved Head once or a few times, nor was there any legal significance as to the exact

number of Proud Boys in the vicinity or whether they could be considered "present" at the

altercation.  Accordingly, if the Court reaches this claim on the merits, I respectfully recommend

the claim be denied as meritless.

### CONCLUSION

For the above reasons, I respectfully recommend that the Petition be denied, and the

case be dismissed.

Dated: August 28, 2023                    Respectfully Submitted,
       New York, New York

                                          *Katharine H. Parker*

                                          KATHARINE H. PARKER
                                          United States Magistrate Judge

37

## NOTICE

The parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P. 72(b)(2).

The parties shall have fourteen days from the date of service of any objections to serve and file any response. Any objections and any responses to such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and served on the other parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge McMahon. The failure to file timely objections shall result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).